BRIAN MICHAELS, OSB # 925607
259 East Fifth Avenue, Suite 300-D
Eugene, Oregon 97401
(541) 687-0578
Fax (541) 686-2137
brian@brianmichaelslaw.com

MARIANNE DUGAN, OSB # 932563
1430 Willamette St. #359
Eugene, Oregon 97401
(541) 338-7072
Fax (866) 650-5213
mdugan@mdugan.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION

| | |
|---|---|
| JUBAL CHAPLIN, and CALEB DANIEL BEECHEM, | CASE NO.:  6:20-cv-175 |
| Plaintiffs, | COMPLAINT |
| | 42 U.S.C. 1983 – |
| V | |
| CITY OF SPRINGFIELD (Both Plaintiffs); OFFICER RYAN STONE (385), (Both Plaintiffs); OFFICER JULIO GARCIA-CASH (397), (for CHAPLIN); OFFICER BRONSON DURRANT (382), SGT. M. MASSEY (338), OFFICER W. HARBERT (377), (for BEECHEM), | UNLAWFUL ARREST AND DETENTION; EXCESSIVE USE OF FORCE; and PUNITIVE DAMAGES |
| Defendants. | JURY TRIAL REQUESTED |

**JURISDICTION AND VENUE**

1.    This is a civil action for damages and attorney's fees, for unlawful arrest and detention; and excessive use of force (Fourth Amendment) under 42 U.S.C. 1983. This Claim for Plaintiff JUBAL CHAPLIN arises out of a February 2, 2018, arrest and assault by Officer Stone, and one or two other assisting officers when Mr. Chaplin was a passenger in a vehicle, after the driver was arrested on a warrant from Eugene Police Department. As a result of being arrested, Mr. Chaplin was handcuffed, placed in a patrol car, and brought to Springfield municipal jail where he had to be bailed out by his family.

2.    This Claim for Plaintiff CALEB DANIEL BEECHEM arises out of a July 23, 2019, 911 call from a neighbor concerning Plaintiff BEECHEM's nonviolent but concerning behavior. Neighbor had a restraining order against Mr. BEECHEM whom she acknowledged had mental illness issues, never describing him as violent, currently or in the past. In fact, the defendants received as copy of the restraining Order.  Ignoring both his mental health issues and the nonviolent nature of his problems, upon arrival Officers Stone and Harbert, immediately grabbed the mentally ill BEECHEM, began beating him for being noncompliant delivering several focused blows to his head and face, and, despite knocking him unconscious, tasing him, while all the while telling him to stop resisting, then arresting him for resisting arrest. At the hospital, Officer Stone pulled the taser barbs out of his skin causing him great pain

3.    Jurisdiction for the federal claims exists under 28 U.S.C. 1331 because this action arises under the laws of the United States.

4.    Venue is proper in this judicial district pursuant to the provisions of 28 U.S.C. 1391(b) in that this is a civil action wherein jurisdiction is not founded on diversity of citizenship and plaintiff's claims arise within this judicial district.

**PARTIES**

5.    At all relevant times, Plaintiffs were residents of Lane County, Oregon.

### FOR CHAPLIN

6.    Defendants Officers STONE and Officer GARCIA are sued in their individual official capacity. They were at all times relevant officers of the Springfield Police Department. Officer Stone, along with Officer Garcia, arrived at the traffic stop of the vehicle Chaplin was riding as a passenger. Following the arrest of the driver, these officers went to the passenger side and ordered Chaplin out of the vehicle for a legal amount of marijuana possession. Before Chaplin could get his second foot on the ground from exiting the vehicle, the officers jumped him, grabbed him, and took him down to the ground, stomping on him while all the while telling him to stop resisting.

7.    The individual defendants' acts which are the subject of this lawsuit were undertaken in the regular course of their employment for defendant City of Springfield.


### FOR BEECHEM

8.    Defendant Officers STONE, Officer DURRANT, Officer W. HARBERT, and SGT. M. MASSEY are sued in their individual official capacity. They were at all times relevant officers of the Springfield Police Department. Stone, along with Durrant, Harbert, and Massey arrived at the location of Beechem's residence following the 911 call. Without provocation or necessity, while ignoring both the obligation to deescalate rather than escalate and the fact Beechem was identified as having mental illness they beat him and arrested him unnecessarily in the manner described in Paragraph 2.

9.    The individual defendants' acts which are the subject of this lawsuit were undertaken in the regular course of their employment for defendant City of Springfield.

10.    Defendant City of Springfield, hereinafter City, is a municipal corporation charged with and responsible for appointing and promoting the members of the Springfield Police Department and its personnel. At all relevant times the City had the power, right and duty to control the manner in which the individual defendants carried out the objectives of their employment, and to see that all orders, rules, training, instructions and regulations promulgated for the Springfield Police Department were consistent with the State and federal constitutions, statutes, and the laws of the municipality. In these two instances, the City was on notice on several different means and formats, even to the point of issuing a "Brady" letter and instituting  a serious investigation into the violent excessive uses of force by Officer Stone, yet did nothing to curtail, train, or institute disciplinary procedures to have prevented these two violent acts from occurring.

## FACTUAL OVERVIEW

## JUBAL CHAPLIN

11.    Paragraphs 1 thru 10 are incorporated herein.

12.  There is a video of the entire interaction described herein.  February 2, 2018, JUBAL CHAPLIN was a passenger in a vehicle stopped for a traffic violation by officer Stone and officer Garcia. After running the driver's name and license, the driver was arrested on an outstanding warrant, negligently not withdrawn by Eugene Police.  On that warrant the driver was arrested. At all times the driver (despite knowing the warrants were withdrawn on a dismissal of all charges) and the police were respectful and peaceful during the arrest.

13.    Mr. Chaplin was then approached by Officer Stone and Officer Garcia. The passenger door was opened, and Mr. Chaplin was ordered out of the car. Just as his second foot reached the ground, the officers jumped him, jumped him, threw him to the ground, jumped on him, and repeatedly assaulted him on the ground. As a result of being arrested, Mr. Chaplin was handcuffed,

placed in a patrol car, and brought to Springfield municipal jail where he had to be bailed out by his family.

14.    Chaplin suffered sufficient injuries to be treated at Urgent Care and is currently receiving treatment for continuing issues and pain.  His ability to work on his home has been halted for a long while and is still moving along at a severely diminished rate.  Chaplin lives in the remote rural area of Christmas Valley requiring long drives for treatment and suffers very cold winters.

## CALEB DANIEL BEECHEM

15.    Paragraphs 1 thru 14 are incorporated herein.

16.    There are two videos of the incident described herein- one from a neighbor's home, and the other from the officers' cameras.

17.    One of BEECHEM's neighbors had been having problems with the behavioral symptoms of BEECHEM's mental health problems.  She obtained a restraining order based upon his odd, yet nonviolent behavior.  BEECHEM lived in a trailer park, where no other residents ever complained about him.

18.    On the day in question, July 24, 2019, the same neighbor, identified as Paula Collette Marten, called 911 on Mr. Beechem. She stated in that call that Beechem suffered from some mental illness. This what Officer Bronson Durrant wrote in his Probable cause Affidavit[1]:

> Paula showed me security camera footage where Beechem had stood on his porch stating loudly "I hate you" and "You're an evil neighbor." He also shined a light directly into Marten's residence. Marten stated she felt "Intimidated" by the comments and action of Beechem so close to her residence. I contacted Beechem at his residence. He confirmed he shined a light into Marten's residence in an

---

[1] Notice Officer Durrant never mentions that Collette advised the police Beechem suffered from some sort of mental illness.

attempt to communicate that he was not happy with the restraining order or the security camera.

19.   Officer Stone, along with Durrant, Harbert, and Massey arrived at the location of Beechem's residence following the 911 call. Without provocation or necessity, while ignoring both the obligation to deescalate rather than escalate and the fact Beechem was identified as having mental illness they beat him repeatedly, arrested him unnecessarily, in the manner described in Paragraph 2. Beechem was transported immediately to the emergency room of McKenzie Willamette, where he received more than a dozen stitches to his lips, was diagnosed with a broken wrist, and suffered multiple deep bruises to his head.  His porch was covered with his blood.

20.   This what Officer Durrant wrote in his Probable cause Affidavit:

> When I went to detain Beechem and he resisted physically as well as attempting to retreat into his residence. I had to deliver numerous focused blows to Beechem in order to gain compliance. He also had to be tased. I received an injury to my right hand that required several stitches. Beechem was charged with Violation of Restraining Order and Resisting Arrest. He was lodged at the Lane County Jail.

21.   The video will speak to what happened. In his report, Durrant does state that Beechem was rendered unconscious by the beating.

22.   Mr. Beechem suffered serious injuries requiring continued attention to this day.

### FIRST CLAIM FOR RELIEF
### (Violation of Constitutional Right to Substantive Due Process
### Excessive Force - Seizure)
### (42 U.S.C. § 1983, Fourth Amendment to the U.S. Constitution)
(Individual Defendants)

23.   The foregoing paragraphs are incorporated herein by reference.

24.    By their actions as described herein, the individual defendants used force on plaintiffs that was not objectively reasonable in light of the facts and circumstances confronting them. Indeed, there was no reason to use force at all on either defendant since there was no crime or reason for the officers to be on Beechem's private property at the time force was employed.

25.    By their actions as described herein, the individual defendants, acting under color of statute, ordinance, regulation, custom, or usage, subjected plaintiffs to the deprivation of rights, privileges, or immunities secured by the Constitution and laws, namely, plaintiffs' liberty interest in freedom from excessive force.

26.    As a result of the individual defendants' actions and inactions against plaintiff CHAPLIN alleged herein, plaintiff suffered, and suffers, serious injury to his back, shoulders, legs, knees, head, emotional distress.

27.    As a result of the individual defendants' actions and inactions alleged herein, plaintiff BEECHEM suffered physical injuries from being tased twice, punched in the face repeatedly, tackled, and subject to excessively tight handcuffing causing long term scars and injuries to his wrists, along with emotional distress.

28.    As a direct result of the individual defendants' actions and inactions alleged herein, Plaintiffs incurred economic damages, in an amount to be determined at trial, for medical expenses, including lost wages.

29.    As a direct result of the individual defendants' actions and inactions alleged herein, plaintiffs sustained noneconomic damages in an amount to be determined at trial, pain and suffering, and loss of enjoyment of life. The actions of the individual defendants, as described in this complaint, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon plaintiffs; and as a result of

said intentional conduct, plaintiffs are entitled to punitive damages against the individual defendants, in an amount sufficient to punish them and to deter others from like conduct.

30. Plaintiffs were required to hire attorneys to represent them in this matter and are entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

31. Plaintiffs are entitled to a jury trial.

**SECOND CLAIM FOR RELIEF**
**(Municipal Liability Claim - 42 U.S.C. § 1983;**
**Monell v. Dept. of Social Services and Adickes v. Kress)**
**(Excessive Force)**
(Both Plaintiffs)
(Defendant City of Springfield)

32. The foregoing paragraphs are incorporated herein by reference.

33. Defendant City of Springfield has failed to properly train its officers in how to handle mental health issues during citizen contacts, and has failed to properly train appropriate level of Constitutionally permitted force; and/or has allowed numerous other similar incidents; and/or has a policy or practice of allowing that level of force; and/or has encouraged or acquiesced in this unlawful behavior, and/or tacitly encouraged or acquiesced in it by failing to train, supervise, or discipline their officers, thus evincing deliberate indifference to plaintiff's constitutional rights, sufficient to support a verdict that those the defendant City's policies, customs, or practices caused the use of excessive force against plaintiffs. Further proof of these allegations are past investigations into the violent behavior of Officer Stone, resulting in the attached June 6, 2018 memo on the investigation, the June 17, 2018 memo, and the Lane County District Attorney's BRADY letter to all defense attorneys.

34. Defendant City is directly liable to plaintiffs for its unconstitutional policies, customs, or practices; and/or for failing to properly train its officers.

35. As a direct and proximate result of the actions and omissions described in this complaint, plaintiffs incurred the damages alleged herein, and were required to hire attorneys to represent them in this matter and is entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

36. Plaintiffs are entitled to a jury trial.

**THIRD CLAIM FOR RELIEF**
**(Violation of Constitutional Right to Substantive Due Process**
**False Arrest and Imprisonment - Seizure)**
**(42 U.S.C. § 1983, Fourth Amendment to the U.S. Constitution**)
(Both Plaintiffs)
(Individual Defendants)

37. The foregoing paragraphs are incorporated herein by reference.

38.  By their actions as described herein, in detaining and arresting both plaintiffs without a warrant, probable cause, or other constitutionally adequate lawful provision, the individual defendants, acting under color of statute, ordinance, regulation, custom, or usage, subjected both plaintiffs to the deprivation of her liberty interests, which constitutes rights, privileges, or immunities secured by the Constitution and laws.

39.   As a direct and proximate result of the unlawful detention and arrest, both plaintiffs sustained actual damages, including loss of his liberty; mental and emotional suffering; humiliation; shame; embarrassment; worry; fear; anguish; shock; nervousness; and anxiety; all to their damage in an amount to be ascertained according to proof at trial.

40.  The actions of the individual defendants, as described herein, were malicious, deliberate, intentional, and embarked upon with the knowledge of, or in conscious disregard of, the harm that would be inflicted upon both plaintiffs. As a result of said intentional conduct, plaintiffs are entitled to punitive damages against the individual defendants in an amount sufficient to punish them and to deter others from like conduct.

41.   Plaintiffs were required to hire attorneys to represent them in this matter and are entitled to an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

42.   Plaintiffs are entitled to a jury trial.


**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs request a jury trial and demands judgment in their favor and against defendants for the relief sought herein; for their reasonable costs and attorney fees; and for any other relief deemed appropriate by the court.


Respectfully submitted this 31st day of January 2020,

BY:

 s/ BRIAN MICHAELS
BRIAN MICHAELS, OSB # 925607
Attorney for Plaintiffs
259 E. 5th Ave., Ste 300D
Eugene, Oregon 97401
541.687.0578

**M E M O R A N D U M**   *Springfield Police Department*

*Committed to Excellence*

June 6, 2018

**To:**   Officer Ryan Stone

**From:**   Richard L. Lewis
Chief of Police

**Subject:**   Allegation of Improper Performance, Tentative Findings and Conclusions and
Notice of Potential Discipline

The purpose of this memorandum is to review with you the results of an internal investigation into allegations of improper performance. Lt. Scott McKee was charged with responsibility of the administrative investigation regarding conduct unbecoming and unlawful detainment. These acts, if true are in violation of Springfield Police Department General Orders.

The internal investigation revealed that you stopped a vehicle operated by Garrison Sialoi for a traffic violation. During the course of the stop you detained Mr. Sialoi in handcuffs without cause. I have reviewed Lt. McKee's report, the dashboard video/audio recording, Sgt. Martin's internal investigation report, your written memorandum and the audio recording of your interview with Lt. McKee and the related transcripts of that interview. These documents are incorporated in this memorandum. I have provided you a copy of the above referenced documents as part of this memorandum. Below is a synopsis of the incident.

## A.   PRELIMINARY FINDINGS OF FACT.

1.   **On February 18, 2018 / 2355 hours you conducted a traffic stop on a vehicle operated by Garrison Sialoi for weaving and failing to signal a lane change. Mr. Sialoi was detained in handcuffs for approximately eleven minutes and eventually released on a citation for failing to signal lane change. The entire encounter is audio/video recorded. The evidence observed on the recording fails to justify the detainment of Mr. Sialoi.**

**You provided several reasons for ordering Mr. Sialoi out of his vehicle to further what is described as a DUII investigation. The stated claims were to remove him from the fast food odors, observe his gait, separate Sialoi from his passenger to help clam him, prevent him from showing off for his wife and assess whether there had been a dispute between the two of them. None of these stated reasons are in combination or in and of themselves, legal justifications to order Mr. Sialoi out of his car. You had made no tangible observations or experienced any odors or signs of impairment concerning Mr. Sialoi's behaviors during your close contact with him that lead you to believe he was under the influence of alcohol or medications.  Regarding removing him from the fast food odor, when Sialoi exited the vehicle you were in a position to immediately assess whether his breath contained an odor**

consistent with intoxicants and in your written report indicate you could not detect any odor. You made no attempt to observe his gait as he was immediately confronted as he exited the driver's door. There is no observable evidence that would lead a reasonable officer to believe that Mr. Sialoi was involved in a dispute with his wife or that he was trying to "show off for her".

Prior to exiting the vehicle Mr. Sialoi exhibits no behavior to suggest he is armed or a threat to you during this encounter. You conclude that due to his "hostility" (while in the vehicle) and his physical size you decide to place him in handcuffs. Mr. Sialoi was not "hostile" prior to the handcuffing. In a later interview with Lt. McKee & Lt. Rappe' you change the description of Mr. Sialoi's demeanor from hostile to "huffy". There is no observable or stated evidence that Mr. Sialoi is armed.

**B.    TENTATIVE CONCLUSIONS.**

With respect to these allegations of misconduct, it is my tentative finding that you are in violation of the following Springfield Police Department General Orders:

1    General Order 41.4.1, <u>Constitutional Rights</u>: It is important in any criminal investigation to ensure that an individual's Constitutional rights are not violated.....

General Order 1.2.2 <u>Use of Discretion</u>: Police officers are sworn to uphold the Constitutions of the United States and the State of Oregon....

General Order 1.1.2 <u>Oath of Office/ Code of Ethics: Attachment B</u>: "As a law enforcement officer, my fundamental duty is to serve mankind: to safeguard lives and property, to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder: and to respect he Constitutional rights of all men to liberty, equality and justice."

The 4th Amendment to the U.S. Constitution prohibits unreasonable searches and seizures. You seized Mr. Sialoi when you handcuffed him as he exited the vehicle. You claimed that you were concerned because of the hostility he had displayed prior, the potential he was carrying weapons and his physical size. Mr. Sialoi was not hostile prior to being handcuffed and there is no evidence observed or stated in your report that he was threatening or armed with a weapon. A reasonable police officer with like training and experience would not have come to this same conclusions based upon all the observable evidence. You also did not have probable cause to order Mr. Sialoi out of the vehicle to further your investigation. Mr. Sialoi was "seized" for eleven minutes and then released on a citation for no turn signal.

2    **General Order 26.1.1** <u>Code of Conduct</u> **Unbecoming Conduct: The conduct of an officer, on or off duty, reflects directly upon the Department. An officer must at all times conduct himself in a manner which does not bring discredit to himself, the Department or the City, or impair the operational efficiency of the Department or employee.**

Your detainment of Garrison Sialoi was unjustified based upon the evidence present in this case. During this investigation you provided a variety or defenses as to why Sialoi needed to be detained for safety reasons, but none are observed on the video/audio recordings rather they appear to be based upon your perception or experience from prior events. The likes of which have no bearing on Garrison Sialoi. Your actions have brought discredit upon yourself and the Department.

I have considered the severity of the misconduct, the actual or likely impact on the Department, the tenure of your service with the City of Springfield Police Department and your service record. I have also considered the importance of officer safety and the difficult circumstances officers face on a routine basis. You have been employed by SPD for over three years and have received several commendations for your service. In addition to the findings in my Tentative Conclusion, aggravating factors are that you are unwilling to accept any responsibility in this matter and your written/verbal description of events conflicts with the observable evidence on the video/audio recordings. The misconduct involves constitutional violations and exposes the City to adverse litigation. Based upon the above findings, it is my tentative conclusion that there is just cause to impose discipline in the form of a 1 day suspension without pay. A work plan will also be imposed as a result of this investigation. Lt. McKee will design a work plan that you will be required to complete. The plan will include training, oversight and review of duty assignments.

If you wish to present any information to me that may have a bearing on my decision in this matter, you may do so in person or in writing. As per SPA Contract, Article 14, the meeting can take place no sooner than seven days from the time you receive this memorandum notifying you of the considered discipline. Please contact me or Wendy Polen to set up a meeting time.

Officer Stone, I must advise you that any further violations regarding judgment, conduct unbecoming or Constitutional violations of a similar nature may result in further discipline, up to and including termination.

_____

Richard L. Lewis
Chief of Police

**Signature of employee acknowledges receipt of this Notice and does not imply agreement with its contents.**

_____

Officer Ryan Stone          Date

*M E M O R A N D U M*   **Springfield Police Department**

COMMITTED TO EXCELLENCE

DATE:       June 17, 2018

TO:         Richard Lewis, Chief of Police

FROM:       Scott McKee, Lieutenant Patrol Services Bureau

RE:         Follow up information concerning Springfield Police Officer
            Ryan Stone – Excessive Force Complaint – Austin Blake Stewart 18-03011

*NOTE:*        *This memorandum documents follow up information concerning the stop of pedestrian, Austin Stewart and the previously sustained allegation of excessive force vs. Officer Stone resulting from his arrest of Austin Blake Stewart on Sunday, 04/07/2018 for Disorderly Conduct and Resisting Arrest – charges which were summarily dismissed by the Springfield City Prosecutor.*

*Specifically, I spoke with Oregon State Police Trooper Jared Anderson regarding follow up investigation of the Austin Stewart arrest resulting from my inquiry about the potential presence of police in-car video evidence from OSP.*

On Thursday morning, June 7, 2018, Lieutenant Rappe asked me about the presence of OSP in-car video evidence while we were discussing the force aspect of this investigation. Specifically, we were discussing the nature and proximity of injury to Stewart – upper left posterior-dorsal rib injury (bruising possible fracture) and the manner in which Stewart was taken to the ground by Officer Stone. I noted that while the actual point Stewart impacted the ground could not be observed on Officer Stone's video due to the fact that Stewart landed on the ground out of camera view, it appeared likely from available video evidence that it was this take-down maneuver by Stone that caused the rib injury to Stewart.

In contrast to the description in the police report prepared by Officer Stone, it is apparent Stewart more likely landed in-part upon the broad paved sidewalk and had likely not, "landed on the grass on his hands and knees" as reported by Officer Stone.

On review, Lieutenant Rappe and I agreed that regardless what surface he landed upon, it seemed logical and likely, given the downward force applied and the rate and angle at which Stewart's body was forcibly compelled to the ground, that Stewart's rib injury was likely the result of a combination of Stewart landing on his left side and the weight of Officer Stone on top of him as he impacted the ground. Essentially, Officer Stone tackled Stewart; landing upon him as he impacted the ground.

1

The manner in which Officer Stone forcibly grabbed and rendered Stewart to the ground "suddenly" in a twisting motion moved Stewart into a clockwise rotation as he fell. Close examination of the video evidence reveals that this twisting motion and momentum produced by the twisting application of force caused Stewart's body to rotate to the extent it appears unlikely he landed onto his hands and knees as reported by Officer Stone. This circumstance makes it possible and likely that Stewart fell upon the upper posterior-dorsal ribcage area where the reported injury, bruising and swelling was later observed.

On Thursday, June 7, 2018 at 1:45 p.m. I spoke with Trooper Anderson via telephone regarding follow up investigation. Trooper Anderson had been interviewed earlier concerning this investigation and provided a statement about his interaction with Officer Stone during the arrest of Austin Stewart. The probative intent of this follow up interview was to determine what, if any force; specifically palm, fist or foot strikes, were delivered by the trooper during the course of his physical response to assist Officer Stone during this incident.

Trooper Anderson confirmed his police in-car video equipment had been down and that this condition had been the apparent result of broad network problems associated with the State Police video platform during a period of days that encompassed this incident.

Trooper Anderson clarified he had responded to assist Officer Stone after having observed the police vehicle situated in the wrong direction facing eastward in the westbound lanes of Main Street at the intersection of Interstate 105 (Bob Straub Pkwy.). Trooper Anderson said the emergency vehicle drew his attention and then he saw the officer was on the ground with a subject. Trooper Anderson pulled behind Officer Stone's vehicle and responded directly to assist on foot.

After Trooper Anderson exited his vehicle, he could see the suspect was on the ground in a "base position" with his hands and knees contacting the ground and his "hind end" close to the ground as well. Trooper Anderson characterized what he observed to be more like "passive resistance" when asked to place the suspect's behavior on a spectrum; with active resistance on one end of the spectrum and passive resistance on the opposite end.

Trooper Anderson could see Officer Stone was positioned on Stewart's right side with both his feet/knees on the ground along Stewart's right side. Trooper Anderson recalled Stewart had his left hand on the grass and that the right hand had been upon or hovering near the grass also. Trooper Anderson said he moved to a position on the left side of Stewart and grabbed for his left hand, intending to move the hand from the ground to a position behind his back for handcuffing.

Trooper Anderson said Stewart had his left arm locked and said Stewart did appear to deliberately move his arm away from the trooper as he attempted to grab it. Trooper Anderson said he maneuvered into a "figure-four" hold in order to gain control of and move the left hand into position for handcuffing. A figure-four arm-lock is a two handed jujitsu method of moving the arm by bending (leveraging) it at the elbow and shoulder to render the hand behind the back or otherwise control the hand/arm.

2

Trooper Anderson noted the condition of both Stewart and Officer Stone to be that of a "stalemate," noting both appeared to be "exhausted" and he said there was a lack of physical struggle on the part of Stewart, but he noticed Officer Stone began to deliver a series of focused blows to Stewart's right side as the trooper closed in to initiate contact. These blows appeared to land upon the right dorsal flank area of Stewart while Officer Stone was commanding Stewart to put his hands behind his back.

As Trooper Anderson grasped control of Stewart in preparation for the figure-four application, he said Officer Stone transitioned from the softening blows to fire his Taser upon Stewart. Trooper Anderson had spoken earlier of surprise related to the application of this weapon upon Stewart and clarified during his previous statement that the application of the Taser surprised him both due to the fact that he did not recall a typical (Taser-Taser-Taser) warning from Officer Stone, but also that he had been generally surprised at the officer's use of the Taser under the circumstances. In additional clarification, Trooper Anderson told me he felt the Taser was not necessary given the relative size of Stewart, the fact that there were two officers present, and the "current behavior" and general lack of physical resistance by Stewart at the time the Taser was deployed.

Trooper Anderson told me he would not have deployed a Taser under the circumstances he witnessed, but admitted he had not been present to see what Stewart had done prior to his arrival and he told me Officer Stone "may have thought he [Stewart] was reaching for something." Trooper Anderson said he did not see Stewart reach for anything and did not hear Officer Stone speak or react to anything Stewart was doing that would lead him to believe there had been such movement by Stewart. Trooper Anderson did hear Officer Stone repeatedly tell Stewart to put his hands behind his back and he made the same announcements.

Notably, Officer Stone mentions in his custody report prepared following the arrest of Stewart that he applied several focus blows due to his concerns about Stewart pulling his right arm under his body and that he may be attempting to access weapons from his waistband or sweatshirt pocket. This was the same justification he articulated in deploying his Taser after the focus blows had no effect. However, Officer Stone had conducted a pat-down search of this area specifically early in his encounter with Stewart when Stewart continually appeared to put his hands near his pockets. This is a search derived from concern for weapons and Officer Stone can be seen thoroughly patting the front abdomen, waist and sweatshirt pocket area, apparently locating nothing of concern. This was prior to the take down.

Trooper Anderson indicated he has been a solo-trooper less than a year and that this incident was only his second field application of force during an arrest. Trooper Anderson remarked that it had been his perception that the entire incident occurred very rapidly, but was clear in his perceptions of the incident. Trooper Anderson did not strike Stewart during the course of this incident.

SPD Taser policy – Springfield Police Department Policy Manual, General Order 1.6.1 states in part, "The Taser may be used by police officers to subdue a person if the person is threatening an officer or another person with physical harm or has signaled an intention to resist the officer's efforts to make an arrest. If possible, a warning of its use shall be given to the suspect."

Springfield Municipal Jail Medical Clinic Records – EMT Jennifer Roberts was consulted concerning Austin Stewart and her physical examination of him during the course of his stay at the Springfield Municipal Jail after his arrest in this case. Roberts has previous patient experience with Stewart and indicated he had been in the facility on prior occasions and that his behaviors fluxuate on a spectrum between being cooperative, nearly catatonic, and sometimes combative or uncooperative. It was Roberts' opinion that he suffers prescription abuse induced psychosis to some extent, indicating Stewart had disclosed to her previously that his substance of abuse had been Robitussin (Dextromethorphan) cough medicine.

There are Clinic Notes in jail records indicating Jail Staff EMT contact and assessments on three occasions during Stewart's stay at the facility. The first assessment occurred on 4/7/18, the day of Stewart's arrest. A jail staff EMT (Matthew Miller) described having attended to Stewart in C Pod as part of a routine post-Tasing assessment. At the time of this contact, Stewart is noted to be "out of it;" noting delays in response and a lost look about him.

On 4/8/18 Jail EMT staff attempted to conduct a medical evaluation but notes indicate Stewart had refused by shaking his head no in response to this request.

On 4/10/18 Jail EMT staff Jennifer Roberts contacted Stewart at his cell following a report that he had a possible fractured rib. The medical evaluation indicated Stewart demonstrated no signs of distress and did not demonstrate any pain or discomfort. Roberts did provide advice concerning rib injury and a referral for outside care.

Ultimately the extent of the rib injury to Stewart is not known. There was visible swelling and bruising to the area and he did complain he thought a rib(s) was broken. It is not known if this self-assessment has any context, ie; if he has had broken ribs before. Also, Stewart was not cooperative in his own care at the jail. It is not known if Stewart has sought care after his discharge from jail, or if he would cooperate in post-injury care/review to determine if there are any remaining symptoms or discoverable evidence of healing injury.

The Lane County District Attorney requested subsequent review of this investigation if there was a finding of excessive force. I will include this supplemental memorandum in the case file pursuant that additional review.

**Scott McKee, Lieutenant**
**Springfield Police Department**
**Patrol Services Division**



**PATRICIA W. PERLOW**
**Lane County District Attorney**

LANE COUNTY DISTRICT ATTORNEY'S OFFICE
125 EAST 8ᵗʰ AVENUE, ROOM 400
EUGENE, OREGON 97401-2926
FAX ONLY (541) 682-3890
(541) 682-4261

# Memorandum

To:         Defense Counsel

From:       Lane County District Attorney's Office

Re:         *Defendant's name; DA No. *

Date:       August 1, 2018

---

Springfield Police Officer Ryan Stone has been identified as a potential witness in this case. The attached discovery includes the April 30, 2018 internal affairs report of SPD Lt. Scott McKee regarding this officer, as well as the June 6, 2018 Findings and Conclusions pertaining to the matters by SPD Chief Richard Lewis. These documents may lead to the discovery of admissible exculpatory evidence by the defense. As such, it is being provided to you under our Brady obligations. However, it is the state's belief that the evidence is not independently admissible under the Oregon Rules of Evidence, nor does it constitute evidence that can be used in the cross examination of Officer Stone. As such, please notify the prosecution in a timely manner prior to trial if the defense intends to use this information, so that the matter can be litigated pretrial to determine whether the use of this evidence complies with the Oregon Rules of Evidence.